# EXHIBIT A



**null / ALL**
**Transmittal Number: 22839650**
**Date Processed: 03/03/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Sharon Coleman<br>AXIS<br>10000 Avalon Blvd.<br>Ste 200<br>Alpharetta, GA 30009-2531 |
| **Electronic copy provided to:** | Michelle Smith<br>Nadine Lewis<br>Frances Mathis |

| | |
|---|---|
| **Entity:** | AXIS Insurance Company<br>Entity ID Number  2563872 |
| **Entity Served:** | AXIS Insurance Company |
| **Title of Action:** | Kimberly Woods vs. York Risk Services Group |
| **Document(s) Type:** | Summons and Amended Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Suffolk County Superior Court, MA |
| **Case/Reference No:** | 2084CV02753 |
| **Jurisdiction Served:** | Massachusetts |
| **Date Served on CSC:** | 03/01/2021 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Regular Mail |
| Sender Information: | Stacy Siegan<br>617-521-7310 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com



# COMMONWEALTH OF MASSACHUSETTS
## Office of Consumer Affairs and Business Regulation
### DIVISION OF INSURANCE
1000 Washington Street • Suite 810 • Boston, MA  02118-6200
(617) 521-7794 • FAX (617) 521-7475
http://www.mass.gov/doi

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

**MIKE KENNEALY**
SECRETARY OF HOUSING AND
ECONOMIC DEVELOPMENT

**EDWARD A. PALLESCHI**
UNDERSECRETARY

**GARY D. ANDERSON**
COMMISSIONER OF INSURANCE

January 29, 2021

AXIS INSURANCE COMPANY
c/o Corporation Service Company
84 State Street
Boston, MA 02109

**Re: Service of Process**

Dear Sir or Madam:

Enclosed you will find legal process which was served upon the Commissioner of Insurance, in his capacity as attorney and registered agent for, Service of Process* for a foreign insurance company, as provided for in Massachusetts General Laws, Chapter 175, §151(3) and §154.

* **Please note:** All future inquiry or correspondence should be directed to the attention of the attorney of record of the enclosed documents.

Sincerely,

Stacy Siegan
Assistant to the General Counsel
(617) 521-7310

Enclosure(s)

# Commonwealth of Massachusetts

SUFFOLK, SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2084 CV02753

Kimberly Woods _____, PLAINTIFF(S),

v.

York Risk Services Group _____, DEFENDANT(S)
and AXIS Insurance Company

### SUMMONS

THIS SUMMONS IS DIRECTED TO AXIS Insurance Company _____. (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Suffolk County Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
   a. Filing your **signed original** response with the Clerk's Office for Civil Business, Superior Court, Pemberton Square, 12th Floor, Boston MA 02108 (address), by mail or in person, **AND**
   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: 400 Crown Colony Drive, Suite 601, Quincy, MA 02169

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Mass. R. Civ. P. 12. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov/courts/case-legal-res/rules of court.

4.   **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.   **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____, 20____.

*Michael Joseph Donovan*

Michael Joseph Donovan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.


# PROOF OF SERVICE OF PROCESS

I hereby certify that on __January 29,__ 20_21_, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4 (d)(1-5)):

By First Class Mail to AXIS Insurance Company c/o Corporation Service Company at 84 State Street, Boston, MA 02109

Dated: ___1/29/2021___, 20__        Signature: __Stacy Siegan__

STACY SIEGAN

N.B.   TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX – BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.



RECEIVED
JAN 2 9 2021
DIVISION OF INSURANCE
LEGAL DIVISION

C O P Y

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPT.
NO.: 2084CV02753

| KIMBERLY WOODS, |
| Plaintiff |
| v. |
| YORK RISK SERVICES GROUP, and AXIS INSURANCE COMPANY, |
| Defendants. |

RECEIVED

JAN 13 2021

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

## AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY

This is a civil action for damages sustained by Plaintiff, Kimberly Woods ("Plaintiff"), due to the bad faith settlement practices of Defendants York Risk Services Group Inc. and AXIS Insurance Company. In support of these claims, Plaintiff states the following:

### THE PARTIES

1.     Plaintiff Kimberly Woods ("Plaintiff") is a resident of the City of Boston, County of Suffolk, Commonwealth of Massachusetts.

2.     Defendant York Risk Services Group, Inc. ("York") is a New York corporation with a principal place of business located at One Upper Pond, Bldg F, City of Parsippany, County of Morris, State of New Jersey and with a registered agent located at 84 State Street, City of Boston, County of Suffolk, Commonwealth of Massachusetts.

3.     Defendant AXIS Insurance Company ("AXIS") is an Illinois corporation with a principal place of business located at 10000 Avalon Boulevard, Suite 200, City of Alpharetta, County of Fulton, State of Georgia.

1

## STATEMENT OF FACTS

**A.     Plaintiff's Accident at Lincoln Plaza**

4.      Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

5.      On or about December 15, 2013, Plaintiff and her daughter, Ms. Brittney Woods ("Plaintiff's daughter") drove to Lincoln Plaza, located at 400 Lincoln Street, Hingham, Massachusetts (hereinafter referred to as the "Premises" and/or "Lincoln Plaza").

6.      Plaintiff arrived at the Premises shortly before noon-time on December 15, 2013.

7.      The parking lot at the Premises was covered with snow.

8.      Plaintiff parked her vehicle in/on the parking lot of the Premises.

9.      After completing their shopping, Plaintiff and Plaintiff's daughter exited the interior of the mall located at the Premises and stepped out onto the exterior sidewalk.

10.     The area of the sidewalk of the Premises in the vicinity of where Plaintiff and Plaintiff's daughter exited the mall building had not been cleared of snow and/or ice.

11.     No reasonable measures such as sanding or salting had been taken to remove, treat, or abate the snow and ice conditions on the areas of the sidewalk of the Premises in the vicinity of where Plaintiff and Plaintiff's daughter exited the mall building.

12.     While walking on the Premises' exterior sidewalk, Plaintiff slipped and fell on the sidewalk.

2

13. The presence of snow, black ice and/or snow-covered ice on the Premises' exterior sidewalk caused Plaintiff to slip and fall (the "Slip & Fall").

14. The Slip & Fall was witnessed by several individuals, including Jeffrey McMillan ("Mr. McMillan") and Plaintiff's daughter.

15. Immediately after witnessing Plaintiff's Slip & Fall, Mr. McMillan entered Pro Sports Shop, Inc., a business leasing a storefront at Lincoln Plaza ("Pro Sports") and reported the Slip & Fall to an employee and asked that employee to call 911.

16. Upon information and belief, the Premises was owned, controlled and/or maintained by CURTLO, LLC ("CURTLO") at the time of the Slip & Fall.

17. Upon information and belief, the Premises was controlled and/or maintained by Curtis Management Corporation ("Curtis") at the time of the slip and fall.

18. Upon information and belief, Taylor Lumber & Hardware Company ("Taylor Lumber") was hired by Curtis to provide snow and ice removal services for the Premises including plowing, sanding, salting, and/or other methods of removal of snow and ice from the parking lot and the sidewalk where the Slip & Fall occurred.

19. Upon information and belief, Taylor Lumber was hired by CURTLO to provide snow and ice removal services for the Premises including plowing, sanding, salting, and/or other methods of removal of snow and ice from the parking lot and the sidewalk where the Slip & Fall occurred.

20. At approximately 12:19 P.M on or about December 15, 2013 Plaintiff's daughter placed a telephone call to and left a voicemail for Curtis reporting the conditions of the sidewalk and the Slip & Fall itself.

3

21.  Plaintiff, her daughter and Mr. McMillan all witnessed untreated black ice in the area where Plaintiff fell.

**B.   Plaintiff's Damages In Underlying Claim**

22.  Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

23.  As a result of the Slip & Fall, Plaintiff incurred and suffered severe emotional pain and distress.

24.  As a result of the Slip & Fall, Plaintiff incurred medical expenses and will continue to incur medical expenses.

25.  As a result of the Slip & Fall, Plaintiff was forced to take vacation time from work to deal with her injuries.

26.  As a result of the Slip & Fall, Plaintiff sustained a loss of earning capacity.

27.  Plaintiff sustained various physical and emotional injuries as a result of the Slip & Fall, including, but not limited to:  a tear of the tibia attachment of the anterior tibiofibular ligament, an early osteochondral lesion of the medial talar dome, mild inflammation of several tendons, right ankle impingement, a nerve stretch injury, nerve damage, Complex Regional Pain Syndrome.

28.  Due to her injuries, Plaintiff was prevented, and will continue to be prevented, from performing her normal daily activities and obtaining the full enjoyment of her life.

**C.   Defendants' Refusal to Make a Reasonable Offer**

29.  Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

4

30. Upon information and belief, at all times relevant to the instant matter, AXIS has been the liability carrier for Taylor Lumber.

31. Upon information and belief, at all times relevant to the instant matter, York is and has been an authorized agent of and/or claims administrator for AXIS Insurance.

32. On or about June 27, 2016, Plaintiff caused a demand letter to be sent to York, AXIS' agent and/or claims administrator, laying out the reasonably clear liability of its insured, Taylor Lumber, and demanding $1,750,000.00 in damages. A copy of the demand letter, dated June 27, 2016, is attached hereto as **Exhibit 1**.

33. On or about December 14, 2016, Plaintiff caused the original Civil Complaint for the underlying claim to be filed with the Court.

34. On or about January 6, 2017, Plaintiff caused Notice of Voluntary Dismissal, without prejudice, to be filed with the Court, withdrawing all claims pursuant to 176D and 93A following agreement by all parties that these claims would be handled separately from the underlying claim.

35. Liability of Taylor Lumber became reasonably clear on the date of the accident, December 15, 2013.

36. Liability became reasonably clear on or about January 7, 2019, the date of the final deposition taken by parties to the underlying claim, as discovery had been exchanged and relevant testimony had been reviewed by all parties.

37. On or about March 5, 2020, over six (6) years after the Slip & Fall and over three (3) years after Plaintiff filed her original Complaint, Parties agreed to submit to mediation of the underlying claims.

38.   On or about June 24, 2020, Plaintiff's counsel made clear that the mediation would pertain only to the underlying claims, unless Defendants preferred to mediate the claims pursuant to 176D and 93A.

39.   Defendants declined to mediate the claims pursuant to 176D and 93A.

40.   On or about June 29, 2020, Parties submitted to a joint mediation of the underlying claims with Brian Mone of Commonwealth Mediation and Conciliation, Inc.

## COUNT I — VIOLATION OF M.G.L. c. 176D and M.G.L. c. 93A
### KIMBERLY WOODS v. AXIS INSURANCE COMPANY

41.   Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

42.   Here, liability for the Slip & Fall has been reasonably clear virtually from the moment it occurred on December 15, 2013.

43.   AXIS, however, failed to make an offer of settlement at any point in time between the day of the Slip & Fall and December 15, 2016, which forced Plaintiff to proceed with litigation.

44.   AXIS, as an insurer for Taylor Lumber, breached its duty owed under 176D § 3(9)(f) and (g) by "failing to effectuate prompt, fair and equitable settlements of claims in which liability has been reasonably clear" and "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."

45.   AXIS' breach of 176D is, itself, a *per se* violation of 93A.

46.   Moreover, AXIS further exhibited bad faith by, among other things:

6

(a)    willfully and/or knowingly engaging in unfair and deceptive insurance practices;

(b)    failing to make a reasonable settlement offer when liability was reasonably clear;

(c)    forcing Plaintiff to pursue a claim on which an offer was never made;

(d)    pursuing unfair and deceptive practices during the claim stage;

(e)    compelling Plaintiff to institute litigation; and

(f)    pursuing a pattern of obstructive and dilatory litigation tactics, the intent of which was to delay settlement.

47.    AXIS breached its duties owed under 176D and 93A by willfully and/or knowingly engaging in unfair or deceptive practices regarding Plaintiff's accidents, all of which occurred in the conduct of trade and commerce.

48.    As a result of AXIS's unfair and deceptive practices, Plaintiff suffered injuries, including but not limited to the loss of money, attorney's fees, costs and expenses and other legally protected interests.

49.    AXIS willfully and/or knowingly engaged in unfair and deceptive claims settlement practices, amounting to bad faith.

50.    As a result of AXIS's bad faith in willfully and/or knowingly engaging in unfair and deceptive practices, Plaintiff is entitled to reasonable damages, as well as treble such amount pursuant to 93A § 9.

51.    Plaintiff has complied with the notice provision of 176D and 93A by mailing a demand letter to Axis's authorized representative and/or claims administrator, York, on June 27, 2016 more than 30 days prior to the filing of this Complaint,

which indicated that failure to provide a reasonable settlement offer would cause Plaintiff to pursue a claim of bad faith.

**WHEREFORE**, Plaintiff, Kimberly Woods, demands judgment against Defendant, AXIS Insurance Company, in an amount to be determined at trial, including but not limited to treble the amount of reasonable damage pursuant to M.G.L. ch. 93A, plus costs, attorneys' fees, and interest from the date of loss and for the proof therefore claims a right to a jury trial for resolution thereof.

### COUNT II — VIOLATION OF M.G.L. c. 176D and M.G.L. c. 93A
### KIMBERLY WOODS v. YORK RISK SERVICES GROUP

52.     Plaintiff incorporates by reference all of the allegations contained in the foregoing paragraphs as if they were fully restated herein.

53.     Here, liability for the Slip & Fall has been reasonably clear virtually from the moment it occurred on December 15, 2013.

54.     York, however, failed to make an offer of settlement at any point in time between the day of the Slip & Fall and December 15, 2016, which forced Plaintiff to proceed with litigation.

55.     York, as authorized representative and/or claims administrator for AXIS, an insurer for Taylor Lumber, breached its duty owed under 176D § 3(9)(f) and (g) by "failing to effectuate prompt, fair and equitable settlements of claims in which liability has been reasonably clear" and "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."

56.     York's breach of 176D is, itself, a *per se* violation of 93A.

57.     Moreover, York further exhibited bad faith by, among other things:

(a)   willfully and/or knowingly engaging in unfair and deceptive insurance practices;

(b)   failing to make a reasonable settlement offer when liability was reasonably clear;

(c)   forcing Plaintiff to pursue a claim on which an offer was never made;

(d)   pursuing unfair and deceptive practices during the claim stage;

(e)   compelling Plaintiff to institute litigation; and

(f)   pursuing a pattern of obstructive and dilatory litigation tactics, the intent of which was to delay settlement.

58.   York breached its duties owed under 176D and 93A by willfully and/or knowingly engaging in unfair or deceptive practices regarding Plaintiff's accidents, all of which occurred in the conduct of trade and commerce.

59.   As a result of York's unfair and deceptive practices, Plaintiff suffered injuries, including but not limited to the loss of money, attorney's fees, costs and expenses and other legally protected interests.

60.   Hanover willfully and/or knowingly engaged in unfair and deceptive claims settlement practices, amounting to bad faith.

61.   As a result of York's bad faith in willfully and/or knowingly engaging in unfair and deceptive practices, Plaintiff is entitled to reasonable damages, as well as treble such amount pursuant to 93A § 9.

62.   Plaintiff has complied with the notice provision of 176D and 93A by mailing a demand letter on June 27, 2016, more than 30 days prior to the filing of this Complaint, which indicated that failure to provide a reasonable settlement offer would cause Plaintiff to pursue a claim of bad faith.

9

**WHEREFORE**, Plaintiff, Kimberly Woods, demands judgment against Defendant, York Risk Services Group, Inc., in an amount to be determined at trial, including but not limited to treble the amount of reasonable damage pursuant to M.G.L. ch. 93A, plus costs, attorneys' fees, and interest from the date of loss and for the proof therefore claims a right to a jury trial for resolution thereof.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,
Plaintiff,
Kimberly Woods,
By her attorneys,

Michael B. Flynn, Esq. BBO No. 559023
mflynn@flynnwirkus.com
Marnix E. Weber, Esq. BBO No. 694834
mweber@flynnwirkus.com
Flynn Wirkus Young, P.C.
400 Crown Colony Drive, Suite 601
Quincy, MA 02169
P: (617) 773-5500
F: (617) 773-5510

Dated: January 12, 2021

# EXHIBIT 1



FLYNN|WIRKUS|YOUNG

A PROFESSIONAL CORPORATION

MICHAEL B. FLYNN, ESQ.
mflynn@flynnwirkus.com
admitted MA, NY, PA, OH

June 27, 2016

Marci Paschel
Sr. Claims Adjuster
York Insurance Services Group, Inc.
Liability Unit
P.O. BOX 183188
Columbus, OH 43218

RE:   Our Client: Kimberly Woods
      Your Insured: Taylor Lumber & Hardware Co.
      Date of Loss: December 15, 2013
      Our File No. 30- 191
      York Claim No.: ARAA-0514A1

### DEMAND FOR SETTLEMENT PURSUANT TO M.G.L. Ch. 93 A

Dear Ms. Paschel:

     As you are aware, our firm represents Kimberly Woods with respect to her injuries and damages incurred as a result of a slip and fall accident on or about December 15, 2013. The accident occurred at 184 Lincoln Street, Hingham MA, 02043 (hereinafter referred to as "Lincoln Plaza"), a premises controlled and/or maintained by Taylor Lumber & Hardware Co. (hereinafter referred to as ("Taylor Lumber"), This is a clear-cut case of liability because this fall was caused by the untreated black ice on your insured's property. Ms. Woods has not recovered and will likely sustain permanent disability and pain and suffering.

I.    **FACTUAL BACKGROUND**

     On December 15, 2013, Ms. Woods was shopping at Lincoln Plaza. She arrived at the parking lot of Lincoln Plaza at approximately noon-time and shopped at various stores in the plaza. After exiting the department store

---

| BUFFALO | BOSTON | PHILADELPHIA |
|---|---|---|
| 534 DELAWARE AVE. | 400 CROWN COLONY DR. | 2424 EAST YORK ST. |
| SUITE 014 | SUITE 601 | SUITE 316 |
| BUFFALO, NY 14209 | QUINCY, MA 02169 | PHILADELPHIA, PA 19125 |
| (716) 858-3112 | (617) 773-5500 | (215) 568-1440 |
| FAX: (877) 299-3962 | FAX: (617) 773-5510 | FAX: (877) 299-3962 |

www.flynnwirkus.com

Marci Paschel
June 27, 2016
Page 2 of 8

Marshall's, Ms. Woods walked down the mall corridor left the shopping plaza though the front exit. At this point, Ms. Woods stepped on an icy portion of the handicap accessibility ramp and fell.

When she fell, Ms. Woods' foot slipped sideways (to the left), her ankle rolled inwards (to the right), and she landed on her buttocks with her legs extended out. Witnesses Deborah Williamson, her son Zachary and her then-boyfriend Jeff MacMillan were in the parking lot getting into their vehicle right before Ms. Woods' accident. Since they were parked right near the handicap ramp, all three witnesses had a clear view of Ms. Woods' painful fall. Mr. MacMillan rushed over to help Ms. Woods while other patrons of Lincoln Plaza also offered their assistance. Foreseeably shocked and in pain, Ms. Woods remained on the ground for almost fifteen minutes. During this time, Mr. McMillan went into a nearby store, Pro-Sports, to report the accident and to notify the management of the black ice and snow conditions outside. Furthermore, as Ms. Woods was being helped into her vehicle, Ms. Williamson and Mr. MacMillan told her about their son Zachary falling earlier.

## II.   LIABILITY

### A. Taylor Lumber's Employees Had Constructive Notice of the Icy Condition Prior of the Parking Lot Prior to Ms. Woods Accident.

The accident happened in the afternoon, during normal business hours. It is our understanding that Curtis Management Corporation (hereinafter referred to as "Curtis Management") contracted with Taylor Lumber to maintain the property of Lincoln Center, which included treating and removing the snow and ice conditions. However, no effort had been made to clear any snow or ice prior to Ms. Woods' fall, despite the fact that the Taylor Lumber employees had actual notice of the icy condition on the date of accident. This is evident because when Mr. McMillan reported the incident to the manager at Pro Sports, the manager informed him that a similar accident had occurred earlier in the day. The manager further stated that he contacted Curtis Management and/or Taylor Lumber after the first incident about the condition of the premises, but they had yet to clear any snow or treat any ice. Ironically, it was not until after Ms. Woods' accident (*at minimum the second reported of the day*) and after her daughter began driving out of the parking lot, that a truck drove into the parking lot to salt the ice.

### B. The Weather Report on the Date of Accident Should Have Put Taylor Lumber's Employees on Notice That Icy Conditions Existed.

Furthermore, the weather alone should have been enough to put Taylor Lumber's employees on notice that black ice conditions were likely to develop.

Marci Paschel
June 27, 2016
Page 3 of 8

This is because the records show that 4.6 inches of snow fell on December 14th and two inches fell on December 15th. See pertinent weather data from the date in question attached as Exhibit A.  More specifically, there was continuous snow and rain accumulation for about ten hours prior to the opening of Lincoln Plaza. Also, the temperature was below freezing from December 7, 2013 through the time of the accident. Given these conditions, it was foreseeable that the sidewalk would be covered with snow and ice.

There is no question that this is a busy commercial shopping establishment and that your insured not only knew – but relied on – customers coming to Lincoln Plaza to shop. It is clear cut that Taylor Lumber's employees did nothing to treat the black ice that developed or the snow and ice that had fallen over it.  The employees even failed to treat it after the first complaint that a patron fell, when there was ample time to remedy the situation before my client's accident took place. Furthermore, the accident happened on the ramp portion of the egress to the parking lot – a portion that should have been maintained even more carefully because of its intended use by both handicapped people and people with disabilities.  Ms. Woods actually chose this ramp to get back to her car because she reasonably thought it would be safer than other options.

### C. Taylor Lumber had duty as a landowner to take reasonable measures and treat snow and ice conditions.

As you must be aware, Massachusetts law has recently undergone significant changes.  One these changes is to impose a duty on landowners and land occupiers to take reasonable measures to treat snow and ice conditions, whether natural or unnatural accumulations. See Papadopoulos v. Target Corp., 457 Mass. 368 (2010). Landowners are no longer afforded the luxury of not treating naturally accumulated snow and ice. Instead, landowners must take now measures under the existing law to treat such accumulations in order to protect people on their property.  In accordance with such measures, the landowner, Curtis Management, delegated a portion or all of this duty to your insured, Taylor Lumber, by way of the contract for snow removal services.

These facts clearly establish that Taylor Lumber, as an agent of Curtis Management, violated the mandates of Massachusetts law laid out in the aforementioned Papadopoulus case that required reasonable measures be taken to treat accumulations of snow and ice.  Therefore, your insured is contributorily negligent for failing to perform the duties set forth under that contract. Particularly, your insured's negligence contributed to creating this significantly dangerous icy area by: (1) failing to treat the snow and black ice that had accumulated for some time before Ms. Woods' accident; and (2) ignoring such conditions even after the first reported accident.

Marci Paschel
June 27, 2016
Page 4 of 8

III.    **INJURIES**

The force of Ms. Woods' fall caused a burning sensation and numbness on the lateral aspect of her right ankle that extended up to the back of her lower leg into her calf. Ms. Woods stayed on the cold, icy sidewalk until her daughter, Mr. McMillan and other patrons helped Ms. Woods in getting up and into her vehicle. Thereafter, Ms. Woods' pain worsened and it was determined that she suffered from a severe ankle sprain and a nerve stretch injury. These conditions lead to the development of Complex Regional Pain Syndrome (CRPS) and the surgical implantation of a spinal cord stimulator (SCS) – a device that will remain in her body for the rest of her life.

On the day of the accident, Ms. Woods went to the Emergency Room, had X-rays done and was put in an air cast and given crutches given that she was unable to put weight on her right ankle or foot. After three weeks of unrelenting pain and enormous swelling, Ms. Woods was seen by Dr. Chris Chiodo, an Orthopedic Surgeon who ordered an MRI. This MRI showed: (1) a complete tear of the tibia attachment of the anterior tibiofibular ligament (a grade three ankle sprain); (2) an early osteochondral lesion of the medial talar dome (growth of cartilage on bone); (3) mild inflammation of several tendons; and (4) diffuse subcutaneous swelling over the anterolateral ankle. This is when Dr. Chiodo also diagnosed Ms. Woods with a stretch injury to the superficial peroneal nerve (the nerve that supplies sensation and motor function to the lower leg and foot). Ms. Woods was prescribed physical therapy and told to use an air boot for six to eight months.

Ms. Woods went to follow-up treatments with Dr. Chiodo and physical therapy in hopes to make a full recovery. However, after four months of grueling physical therapy (and other treatments such as Neurontin cream and joint injections), Ms. Woods was reevaluated by Dr. Chiodo. He noted that she was still experiencing constant 4-5 rated pain with continued feelings of sharp, electricity-type pain and was prone to persistent swelling and deformity of the ankle. She continued a steroid leg injection in an attempt to paralyze a particular nerve and to treat the extreme pain she was experiencing. Notably, Ms. Woods was has limited mobility because she could not bear any weight on her foot without the air boot and unable to drive because she was in an air boot and given the pain she was experiencing with her ankle.

Dr. Chiodo ordered another MRI that showed no improvement. At this time, Dr. Chiodo determined the source of her continued pain was most likely from the stretch injury to her superficial peroneal nerve and also the small osteochondral lesion noted on her talar dome. He prescribed more physical therapy and Lidoderm patches to treat the pain and burning sensations. The physical therapy was not helping strengthen her muscles because her right foot

Marci Paschel
June 27, 2016
Page 5 of 8

would swell up after just 3-5 minutes of PT exercises.  The pain level was excruciatingly unbearable.  For five months, Ms. Woods walked with a cane.

In February 2014, given these symptoms, Ms. Woods was diagnosed with Complex Regional Pain Syndrome (CRPS), described as excessive pain in a region of the body.  CRPS is a nerve disorder which oftentimes develops after a fractured limb has been treated with immobilization, as is the case here.

In August 2014, Ms. Woods underwent surgery – a right ankle arthroscopy with extensive anterior debridement and micro fracture of the medial osteochondral lesion was done to try and relieve her right ankle impingement. Following surgery, Dr. Chiodo placed Ms. Woods into a new air boot and instructed that Ms. Woods be in bed rest for two months. A month later, even though she had less overall pain – persistent was her nerve pain; this lead to a diagnosis of neuropathy.  She was prescribed Lyrica and Elavil, which helped curb her pain but did not resolve it. Dr. Issa then performed two sessions of back injections in an attempt to reset client's nerves – also to no avail.

In May 2015, Dr. Issa determined Ms. Woods would be a good candidate for Spinal Cord Stimulation (SCS), a treatment for CRPS. Ms. Woods did well with the SCS trial and opted to have the device permanently implanted for pain control. Even though she thought this would rid her of pain, it has yet to cease. Ms. Woods' pain level is normally between three and five but sometimes it becomes unbearable. However, having the ability to change the setting on the device allows Ms. Woods to intercept the pain when it gets to that point.

In sum, Ms. Woods underwent eleven months of physical therapy (March 2014 to Feb 2015), surgical debridement, and several medical treatments to control her persistent nerve pain.  Her ultimate CRPS diagnosis required an SCS device implantation.  Additionally, after her August 2015 surgery, Ms. Woods also had to see a specialist for weight loss. Since the accident, Ms. Woods has gained 100 pounds from her inability to exercise and has been left with a physical deformity of her right ankle and foot. Despite having weight loss surgery on March 28, 2016, she continues to struggle with her weight, pain, and discomfort – all of which have significantly affect her every day life in many ways.

## IV.    DAMAGES

### A. Personal Lifestyle Changes

As a result of her injuries and the onset of her nerve damage, Ms. Woods' personal life has changed drastically. Prior to the accident, Ms. Woods was physically active and enjoyed a number of recreational activities.  She exercised four to five days a week with her workouts consisting of walking, biking, jump roping, and playing basketball with her granddaughter, nieces and nephews.

Marci Paschel
June 27, 2016
Page 6 of 8

However, since this incident, her exercise is limited to walking from her door steps to her vehicle and even that is cut very short by pain. Additionally, Ms. Woods loved to wear high heels on a daily basis, but now is unable to. She also attended many social events, but due to her severe weight gain and lack of mobility she has become so depressed that she often turns down these invites. It has been a struggle for her to be social because she does not like the way she looks or feels. At this point, but for a doctor's appointments, Ms. Woods has to really force herself to leave the house.

Prior to her injuries, she enjoyed spending time with her boyfriend and family members including mother, brothers, daughter, granddaughter, nieces and nephews – all of whom live in the immediate vicinity of Ms. Woods. Ms. Woods used to participate in many outdoor activities, and namely enjoyed taking her granddaughter, nieces and nephews to the park, zoo, and movies. Ms. Woods looked forward to spending the rest of her active years fully engaged with her granddaughter, nieces and nephews. Now, as a result of your insured's extreme negligence, she dishearteningly has to watch them grow up from the sidelines.

Last, but certainly not least, Ms. Woods has lost her mobility, the freedom that comes with it, and her privacy. After receiving the Spinal Chord Stimulation device, Ms. Woods was cleared to drive. However, she cannot drive any moderate or long distances without a passenger who can take over the vehicle if she starts to get pain in her foot. Accordingly, she is forced to depend on other people for rides everywhere. She also needs constant supervision, since even showering has become a difficult process given the horrible pain her foot experiences when it touches water. Also prior to the accident, Ms. Woods was the sole care taker for her elderly mother. To her humiliation those roles have been switched. She also needs help doing simple things like getting dressed and cooking. The fact of the matter is that she needs full time aid and if Ms. Woods didn't have such a supportive family structure, she would be forced to live in a rehabilitation facility. It is not hard to see just how much her independence has been hindered.

## B. Professional Lifestyle Changes

Ms. Woods' life has changed drastically in a professional capacity as well. At the time of the accident, Ms. Woods held a full-time job as a Director of Constituent Services (Manager V) of the Executive Office of Health and Human Services for the Commonwealth of Massachusetts. This position requires her to participate in meetings held in various locations – to which she often walked. She also enjoyed walking home from work (about 6.5 miles) whenever the weather permitted. She is now forced to work from home because of her mobility issues, which rightfully makes her feel extremely isolated. Moreover, her position is now limited to interacting with others via telephone and email. She also has foregone work trainings and activities because of her inability to walk far

Marci Paschel
June 27, 2016
Page 7 of 8

distances or sit or stand for long periods of time. In essence, Ms. Woods has gone from one extreme to the other and is simply unable to perform all of the responsibilities that her position calls for. This has dramatically compromised her opportunities for advancement.

### C. Past Loss Wages

Ms. Woods is an hourly employee earning $48.44 per hour. Due to the accident, she missed many full (and portions of) work days because of doctor's appointments, surgeries, recovery periods, and days when her pain is so bad she cannot get out of bed. Her past lost wages are approximately $21,592.13.

### D. Future Loss Wage Capacity

While Ms. Woods is fortunate that her employer is willing to accommodate her medical restrictions, she is likely unable to qualify for a promotion because of the issues discussed herein. Ms. Woods has passed up applying for several promotions because they required her to travel. Without these injuries Ms. Woods would have applied for at least two positions that she would have otherwise qualified: the Implementation MassHealth Enrollment Center Director and Assistant Director of the Chelsea MassHealth Enrollment Center. Both of these positions had a starting salary of $110,000, an increase in salary from her current position by approximately $5,542 per year. Accordingly, as a 47-year old woman at the time of her accident, Ms. Woods was expecting to work at least to the Social Security retirement age of 65. Her lost opportunity to obtain a promotion is equivalent to $99,756.00. This brings her total lost earning capacity to at least $121,348.13.

### E. Past and Future Medical Expenses

Additionally, to date, Ms. Woods' medical bills are nearly $81,154.94. However, this calculation does not include her weight loss surgery. These records and bills are forthcoming. Finally, Ms. Woods will incur additional medical bills for the rest of her life in order to treat her CRPS as she continues to suffer from symptoms related to the nerve damage in her ankle. We intend to retain a life-care planner to estimate the cost of these future medicals, but it is expected that estimated to exceed $200,000.00.

### F. Out of Pocket Expenses

CPCS is incurable and causes extreme debilitating pain, numbness and swelling. Thus, one of the modalities of treatment for someone who suffers from such a severe case of CPCS is pain management. As you know, the main component of pain management is pain medications. Ms. Woods has been prescribed Oxycodone, Ibuprofen, Lyrica and Elavil and is expected to be on

Marci Paschel
June 27, 2016
Page 8 of 8

these medications for the rest of her life. The cost of such medications is astronomical. She has paid $1,875.37 so far for pain medications, and with a life expectancy of 83 years old, it is likely that she will incur an additional $33,578.00 just for these prescriptions throughout her life time. Given the aforementioned transportation issues, Ms. Woods has also incurred $365.00 so far to get to and from her doctors appointments. The co-payment bills for her surgery and doctor's appointments are still forthcoming. Even without those bills, Ms. Woods' out of pocket expenses as of today are $35,818.37.

## V.   REQUEST FOR RELIEF

By now, you are well aware that Ms. Kimberly Woods sustained serious injures as a result of this incident and makes a formal demand of $1,750,000.00 to settle this claim. If we do not receive a reasonable settlement offer within the required thirty (30) days, we intend to file a lawsuit pursuant to Ch. 93A on behalf of Ms. Woods against York Insurance Services Group, in connection to the lawsuit we plant to bring against your insured.

Thank you for your attention to this matter.

Sincerely,

Michael B. Flynn

MBF/sss
cc:   Kimberly Woods
      Sania S. Santos, Esq.
G:\F & A\CASE FILES\Plaintiff Cases\Woods\Correspondence\Other\2016\Demand Letter\6.27.16 Ltr to York Insurance Services Group Inc. demand letter.doc

# Exhibit A

# DECEMBER 2013
# LOCAL CLIMATOLOGICAL DATA
## NOAA, National Climatic Data Center

**MILTON, MA**
**BLUE HILL OBSERVATORY (KMQE)**
Lat:42° 12'N   Long: 71° 6'W   Elev (Ground) 625 Feet
Time Zone : EASTERN   WBAN: 14753   ISSN#: 0198-2443

*DECEMBER 2013 MILTON, MA*

| Date | Max | Min | Avg | Dep from Normal | Avg Dew Pt | Avg Wet Bulb | Heating | Cooling | Weather | Depth | Water Equiv 0700 | Snowfall | Water Equiv 2400 | Avg Speed | Max 2-SEC Speed | Dir | 3-MIN Speed | Dir | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 45 | 30 | 38 | 2 | | | 27 | 0 | RA SHRA DZ | 9 | | 0.0 | 0.28 | 11.6 | 22 | 15 | 18 | 15 | 01 |
| 02 | 38 | 34 | 36 | 0 | | | 29 | 0 | SHRA | 0 | | 0.0 | T | 4.4 | 15 | 31 | 11 | 31 | 02 |
| 03 | 45 | 33 | 39 | 4 | | | 26 | 0 | FG+ FG | 0 | | 0.0 | 0.00 | 8.9 | 16 | 35 | 13 | 33 | 03 |
| 04 | 43 | 29 | 36 | 1 | | | 29 | 0 | | 0 | | 0.0 | 0.00 | 8.3 | 21 | 29 | 14 | 29 | 04 |
| 05 | 53 | 38 | 46 | 11 | | | 19 | 0 | SHRA DZ | 0 | | 0.0 | 0.02 | 12.5 | 30 | 18 | 27 | 18 | 05 |
| 06 | 55 | 33 | 44 | 10 | | | 21 | 0 | RA SHRA DZ PL FG+ | T | | T | 0.30 | 11.7 | 25 | 20 | 22 | 20 | 06 |
| 07 | 40 | 26 | 33 | -1 | | | 32 | 0 | RA FZRA SN SHSN PL | T | | T | 0.12 | 10.0 | 23 | 31 | 18 | 31 | 07 |
| 08 | 30 | 22 | 26 | -7 | | | 39 | 0 | SN | T | | T | T | 5.9 | 25 | 31 | 19 | 31 | 08 |
| 09 | 41 | 25 | 33 | 0 | | | 32 | 0 | SHRA DZ SN SG PL BR | T | | 0.4 | 0.15 | 10.5 | 28 | 09 | 22 | 09 | 09 |
| 10 | 33. | 21 | 27 | -6 | | | 38 | 0 | SN BR | T | | 2.1 | 0.14 | 11.5 | 28 | 27 | 24 | 27 | 10 |
| 11 | 28 | 19 | 24 | -8 | | | 41 | 0 | | 2 | | 0.0 | 0.00 | 14.0 | 27 | 22 | 20 | 24 | 11 |
| 12 | 23 | 14 | 19 | -13 | | | 46 | 0 | | 1 | | 0.0 | 0.00 | 11.4 | 28 | 27 | 22 | 31 | 12 |
| 13 | 28 | 14 | 21 | -11 | | | 44 | 0 | | 1 | | 0.0 | 0.00 | 14.2 | 31 | 27 | 24 | 27 | 13 |
| 14 | 28 | .9 | 19 | -12 | | | 46 | 0 | SN | 1 | | 4.8 | 0.45 | 9.7 | 30 | 09 | 22 | 09 | 14 |
| 15 | 36 | 21 | 29 | -2 | | | 36 | 0 | RA FZRA SN FG+ BR | 1 | | 2.0 | 0.98 | 19.5 | 40* | 04 | 38* | 04 | 15 |
| 16 | 27 | 14 | 21 | -10 | | | 44 | 0 | | 7 | | 0.0 | 0.00 | 15.1 | 36 | 27 | 26 | 27 | 16 |
| 17 | 23 | 7* | 15 | -16 | | | 50 | 0 | SN | 7 | | 5.5 | 0.53 | 11.0 | 28 | 36 | 22 | 36 | 17 |
| 18 | 32 | 15 | 24 | -6 | | | 41 | 0 | | 13 | | 0.0 | 0.00 | 14.8 | 29 | 23 | 29 | 18 | 18 |
| 19 | 42 | 22 | 32 | 2 | | | 33 | 0 | | 10 | | 0.0 | 0.00 | 14.4 | 38 | 22 | 26 | 22 | 19 |
| 20 | 52 | 34 | 43 | 13 | | | 22 | 0 | | 9 | | 0.0 | 0.00 | 13.8 | 26 | 20 | 23 | 20 | 20 |
| 21 | 57 | 42 | 50* | 20 | | | 15 | 0 | | 4 | | 0.0 | 0.00 | 17.4 | 28 | 21 | 23 | 20 | 21 |
| 22 | 63* | 35 | 49 | 20 | | | 16 | 0 | SHRA | T | | 0.0 | 0.01 | 15.6 | 37 | 22 | 31 | 22 | 22 |
| 23 | 37 | 32 | 35 | 6 | | | 30 | 0 | RA DZ FG+ | T | | 0.0 | 0.73 | 8.2 | 24 | 11 | 17 | 31 | 23 |
| 24 | 36 | 25 | 31 | 2 | | | 34 | 0 | SHSN | T | | T | T | 11.3 | 25 | 31 | 24 | 31 | 24 |
| 25 | 25 | 13 | 19 | -10 | | | 46 | 0 | | 6 | | 0.0 | 0.00 | 10.0 | 29 | 27 | 21 | 31 | 25 |
| 26 | 35 | 19 | 27 | -1 | | | 38 | 0 | SG SHSN | T | | 0.5 | 0.05 | 10.9 | 24 | 27 | 20 | 27 | 26 |
| 27 | 32 | 22 | 27 | -1 | | | 38 | 0 | | T | | 0.0 | 0.00 | 12.3 | 25 | 27 | 20 | 27 | 27 |
| 28 | 46 | 25 | 36 | 8 | | | 29 | 0 | RA DZ | T | | 0.0 | 1.23 | 14.5 | 30 | 24 | 24 | 22 | 28 |
| 29 | 42 | 34 | 38 | 10 | | | 27 | 0 | | 0 | | 0.0 | 0.00 | 13.4 | 36 | 22 | 27 | 22 | 29 |
| 30 | 39 | 17 | 28 | 0 | | | 37 | 0 | | 0 | | 0.0 | 0.00 | 14.3 | 38 | 27 | 27 | 27 | 30 |
| 31 | 24 | 11 | 18 | -9 | | | 47 | 0 | | 0 | | 0.0 | 0.00 | 8.8 | 30 | 27 | 31 | 31 | 31 |
| | 38.0 | 23.7 | 30.9 | ☐ | | | 33.9 | 0.0 | <MONTHLY AVERAGES   TOTALS > | | 15.5 | 5.27 | | 11.9 | | | | | <MONTHLY AVERAGES |
| | -1.1 | 0.1 | -0.4 | | | | | | <DEPARTURE FROM NORMAL > | | | 0.38 | | | | | | | |

SUNSHINE, CLOUD, & VISIBILITY TABLES ON PAGE 3

## DEGREE DAYS

| | MONTHLY TOTAL | DEPARTURE | SEASON TO DATE TOTAL | DEPARTURE |
|---|---|---|---|---|
| HEATING: | 1052 | 9 | 2276 | -28 |
| COOLING: | 0 | 0 | 699 | 97 |

GREATEST 24-HR PRECIPITATION :   1.43   DATE : 14-15
GREATEST 24-HR SNOWFALL :   6.8   DATE : 14-15
GREATEST SNOW DEPTH :   11   DATE : 18

SEA LEVEL PRESSURE
MAXIMUM :   30.61   08   9999
MINIMUM :   29.39   29   9999

NUMBER OF DAYS WITH ->

| | | | | |
|---|---|---|---|---|
| MAXIMUM TEMP >= 90 : | 0 | MINIMUM TEMP <= 32 : | 23 | PRECIPITATION >= 0.01 INCH : 13 |
| MAXIMUM TEMP <= 32 : | 11 | MINIMUM TEMP <= 0 : | 0 | PRECIPITATION >= 0.10 INCH : 10 |
| THUNDERSTORMS : | 0 | HEAVY FOG : | 4 | SNOWFALL >= 1.0 INCH : 4 |

# HOURLY PRECIPITATION
## (WATER EQUIVALENT IN INCHES)

MILTON, MA (KMQE)
DECEMBER 2013          WBAN # 14753

| Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | Sum of Hourly Data | Water Equiv. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | | | T | T | T | T | T | | T | T | T | T | | 0.01 | 0.13 | 0.09 | 0.03 | 0.02 | T | T | T | | | | 0.28 | 0.28 |
| 02 | | | | | | | | | | | | | T | T | | | | | | | | | | | T | T |
| 03 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 04 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 05 | | | | | | | | | | | T | 0.01 | T | T | T | T | T | | | T | T | T | 0.01 | 0.02 | 0.02 |
| 06 | 0.05 | 0.04 | T | 0.01 | 0.01 | T | T | T | T | T | 0.01 | T | T | 0.01 | T | | T | | 0.02 | 0.01 | 0.01 | 0.12 | 0.09 | 0.11 | 0.38 | 0.38 |
| 07 | | | | | | | | | | | | | | | | | | | | | | | | | 0.12 | 0.12 |
| 08 | | | | | | | | | | | | | | | | | | | | | | | | T | T | T |
| 09 | | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.02 | 0.01 | 0.06 | 0.01 | 0.04 | 0.02 | 0.01 | 0.01 | 0.01 | 0.02 | 0.03 | 0.01 | T | T | T | | | | 0.35 | 0.35 |
| 10 | | | | | | | | | | T | 0.01 | 0.01 | T | 0.01 | 0.01 | 0.02 | 0.03 | 0.01 | | | | | | | 0.14 | 0.14 |
| 11 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 12 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 13 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 14 | | | | | | | | | | | | T | T | T | T | 0.01 | 0.02 | 0.01 | 0.03 | 0.02 | 0.02 | 0.07 | 0.11 | 0.16 | 0.45 | 0.45 |
| 15 | 0.09 | 0.07 | 0.12 | 0.11 | 0.22 | 0.18 | 0.09 | 0.04 | 0.06 | | | | | | | | | | | | | | | | 0.98 | 0.98 |
| 16 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 17 | | | | | | | | | | | | T | 0.02 | 0.01 | 0.02 | 0.08 | 0.07 | 0.08 | 0.10 | 0.08 | 0.04 | 0.02 | 0.01 | | 0.53 | 0.53 |
| 18 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 19 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 20 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 21 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 22 | | | | T | | T | | | | | | | | | | | 0.01 | | | | | | | | 0.01 | 0.01 |
| 23 | | | | T | | T | | T | 0.01 | 0.07 | 0.09 | 0.06 | 0.04 | 0.05 | 0.03 | 0.16 | 0.10 | 0.05 | 0.03 | T | | 0.01 | 0.03 | T | 0.73 | 0.73 |
| 24 | | | | | | | | | | | | | | | | | | | | T | T | | | | T | T |
| 25 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 26 | | | | | | | | | | T | 0.01 | 0.04 | | | 0.01 | 0.02 | | | | | | | | | 0.05 | 0.05 |
| 27 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 28 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 29 | | | | | | | | | | | | | | 0.02 | 0.08 | 0.11 | 0.07 | 0.21 | 0.30 | 0.24 | 0.11 | 0.04 | 0.05 | T | 1.23 | 1.23 |
| 30 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |
| 31 | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 | 0.00 |

*\* Indicates sum of Hourly and Daily disagree.*

## MAXIMUM SHORT DURATION PRECIPITATION (See Note)

| Time Period (Minutes) | 5 | 10 | 15 | 20 | 30 | 45 | 60 | 80 | 100 | 120 | 150 | 180 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Precipitation (Inches) | 0.07 | 0.08 | 0.11 | 0.14 | 0.19 | 0.28 | 0.35 | 0.44 | 0.52 | 0.60 | 0.69 | 0.75 |
| Ending Date | 17 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 23 | 29 | 29 |
| Ending Time (Hr/Min) | 2309 | 1908 | 1909 | 1914 | 1919 | 1919 | 1919 | 1919 | 1927 | 1933 | 1946 | 1957 |

Date and time are not entered for TRACE amounts.

Note : The hourly and daily precipitation totals are printed in the last 2 columns and hi-lighted in red when they disagree. NWS does not edit ASOS hourly values but may edit daily and monthly totals. Hourly, daily, and monthly totals are printed as reported by the ASOS site.

NOAA, National Climatic Data Center          PAGE 2

## REFERENCE NOTES & SUPPLEMENTAL SUMMARIES

\* = Extreme for the month (last occurrence if more than one).

T = Trace precipitation amount.

+ = also occurs on earlier date.

FG+ = Heavy fog, visibility .25 miles or less. BLANK entries denote missing or unreported data.

Resultant wind is the vector sum of the wind speeds and directions divided by the number of observations.

Wind direction is recorded in tens of degrees (2 digits) clockwise from true north. '00' = calm, 'VR' = variable.

Precipitation is for the 24-hour period ending at the time indicated in the column heading.

Ceilometer (30-second) data are used to derive cloudiness at or below 12,000 feet. This cloudiness is the mean cloud cover detected during sunrise to sunset (SR-SS), or midnight to midnight (MN-MN).

## WEATHER NOTATIONS

| QUALIFIER | WEATHER PHENOMENA | | |
|---|---|---|---|
| DESCRIPTOR | PRECIPITATION | OBSCURATION | OTHER |
| BC Patches | DZ Drizzle | BR Mist | DS Duststorm |
| BL Blowing | GR Hail | DU Widespread Dust | FC Funnel Cloud |
| DR Low Drifting | GS Small Hail and/or Snow Pellets | FG Fog | +FC Tornado Waterspout |
| FZ Freezing | IC Ice Crystals | FU Smoke | PO Well-Developed |
| MI Shallow | PL Ice Pellets | HZ Haze | Dust/Sand Whirls |
| PR Partial | RA Rain | | |
| SH Shower(s) | SG Snow Grains | PY Spray | SQ Squalls |
| TS Thunderstorm | SN Snow | | SS Sandstorm |
| VC In the Vicinity | UP Unknown Precipitation | SA Sand VA Volcanic Ash | GL Glaze |

Intensity (as indicated on pages 4 to 6):
'+' = Heavy    ' ' = Moderate    '-' = Light

## MILTON, MA
## DECEMBER 2013

Sky Condition is based on the sum (not to exceed 8) of the sunrise to sunset cloud cover below and above 12,000 feet.

Clear = 0-2 oktas, Partly Cloudy = 3-6 oktas, Cloudy = 7-8 oktas.

A Heating (Cooling) Degree Day is the difference between the average daily temperature and 65 degrees F. The HDD season begins July 1, the CDD season begins January 1.

Snow Depth, Snowfall, and Sunshine data may come from nearby sites that the National Weather Service deems Climatologically representative of this site.

NORMALS ARE FOR THE YEARS 1981-2010

### ADDITIONAL NOTES & ERRATA:

NOTE: From Nov 1998 until Feb 2009, LCD is combination of ASOS & manual OBS. Manual is pcpn & snow data. Starting with Mar 2009 LCD is all manual Obs., No ASOS data.

Beginning with the January 2013 LCD, monthly mean temperature calculations have changed to the National Data Stewardship Team standard. Monthly maximum and minimum temperature are not rounded until after monthly mean temperature is calculated. This is the most accurate outcome, but may be slightly different from the mean derived from rounded monthly maximum and minimum.

| Date | VISIBILITY (MILES) | |
|---|---|---|
| | MINIMUM | MAXIMUM |
| 01 | | |
| 02 | | |
| 03 | | |
| 04 | | |
| 05 | | |
| 06 | | |
| 07 | | |
| 08 | | |
| 09 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| AVGS | | |

MINIMUM VISIBILITY (MILES)
<= .25    <= 1.0    >= 7.0

PAGE 3



# DECEMBER 2013
# MILTON, MA

# LOCAL CLIMATOLOGICAL DATA

## NOAA, National Climatic Data Center

*I certify that this is an official publication of the National Oceanic and Atmospheric Administration (NOAA). It is compiled using information from weather observing sites operated by NOAA-National Weather Service / Department Of Transportation-Federal Aviation Administration and received at the National Climatic Data Center (NCDC), Asheville, North Carolina 28801.*

**DIRECTOR**

NCDC now offers free online access to the **Edited Local Climatological Data Publication.** Go to : www.ncdc.noaa.gov and choose Most Popular.

We welcome your questions or comments, please contact us at:
(828) 271-4800, option 2
Fax Number : 828-271-4876
TDD : (828) 271-4010
or Email : ncdc.orders@noaa.gov

NOAA\National Climatic Data Center
Attn: User Engagement & Services Branch
151 Patton Avenue
Asheville, NC 28801-5001

United States
Department of Commerce

National Oceanic and
Atmospheric Administration

National Environmental Satellite
Atmospheric Administration

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 2084CV 02753 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

**PLAINTIFF(S):** Kimberly Woods
**ADDRESS:** 15 Oakley Street, Apt. 1, Dorchester, MA 02124

**COUNTY** Suffolk

**DEFENDANT(S):** 1) York Risk Services Group; 2) AXIS Insurance Company

**ATTORNEY:** 1) Michael B. Flynn, Esq.; 2) Mamix E. Weber, Esq.
**ADDRESS:** Flynn Wirkus Young, P.C.,
400 Crown Colony Drive, Suite 601, Quincy, MA 02169

**ADDRESS:** 1) 1 Upper Pond Rd., Building F, Parsippany, NJ, 07054; Registered Agent at
84 State Street, Boston, MA 02109; 2) 10000 Avalon Blvd., Suite 200, Alpharetta, GA 30009

**BBO:** 1) 559023; 2) 694834

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. B99 | TYPE OF ACTION (specify) Other Tortious Action | TRACK F | HAS A JURY CLAIM BEEN MADE? [X] YES [ ] NO |
|---|---|---|---|

**\*If "Other" please describe:** This is a bad faith claim under G.L. chs. 93A and 176D. Damages to be determined.

Is there a claim under G.L. c. 93A? [X] YES [ ] NO
Is this a class action under Mass. R. Civ. P. 23? [ ] YES [X] NO

*RECEIVED*

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

*JAN 13 2021*
*SUPERIOR COURT-CIVIL*
*MICHAEL JOSEPH DONOVAN*
*CLERK/MAGISTRATE*

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .......... $____
2. Total doctor expenses .......... $____
3. Total chiropractic expenses .......... $____
4. Total physical therapy expenses .......... $____
5. Total other expenses (describe below) .......... $____
Subtotal (A): $____

B. Documented lost wages and compensation to date .......... $____
C. Documented property damages to date .......... $____
D. Reasonably anticipated future medical and hospital expenses .......... $____
E. Reasonably anticipated lost wages .......... $____
F. Other documented items of damages (describe below) .......... $____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ Reserved

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

[ ] This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $____

**Signature of Attorney/ Unrepresented Plaintiff: X**   Date:

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

1684-cv-03822; Kimberly Woods  et al. v. Curtio, LLC. et al.; Suffolk County

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record: X**   Date: 1/12/21

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 2084CV02753 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| **CASE NAME:** Woods, Kimberly vs. York Risk Services Group et al | | Michael Joseph Donovan, Clerk of Court |
| **TO:** | | **COURT NAME & ADDRESS** Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION**                    **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 03/01/2021 | |
| Response to the complaint filed (also see MRCP 12) | | 03/31/2021 | |
| All motions under MRCP 12, 19, and 20 | 03/31/2021 | 04/30/2021 | 06/01/2021 |
| All motions under MRCP 15 | 03/31/2021 | 04/30/2021 | 06/01/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 09/27/2021 | | |
| All motions under MRCP 56 | 10/27/2021 | 11/26/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 03/28/2022 |
| Case shall be resolved and judgment shall issue by | | | 12/01/2022 |

**The final pre-trial deadline is not the scheduled date of the conference.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| **DATE ISSUED** 12/01/2020 | **ASSISTANT CLERK** Anh T Bungcayao | | **PHONE** (617)788-8131 |
|---|---|---|---|

Date/Time Printed: 12-01-2020 11:34:25                                    SCV026\ 08/2018



**COMMONWEALTH OF MASSACHUSETTS**
**DIVISION OF INSURANCE**
1000 WASHINGTON STREET, SUITE 810
BOSTON, MA 02118-6200



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 02118   $ 002.00⁰
02 4W
0000367743 FEB 05 2021



**COMMONWEALTH OF MASSACHUSETTS**
**DIVISION OF INSURANCE**
1000 WASHINGTON STREET, SUITE 810
BOSTON, MA 02118-6200

**AXIS INSURANCE COMPANY**
c/o Corporation Service Company
84 State Street
Boston, MA 02109